IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHLOE MORGAN COUSINO, | ) | Case No. 3:22-cv-1712 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Chloe Morgan Cousino, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for Child's Insurance Benefits ("CID") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. Cousino challenges the Administrative Law Judge's ("ALJ") negative findings, arguing that the ALJ: (i) failed to identify autism as a medically determinable impairment; (ii) failed to consider the record as a whole by not discussing her supervisor's work activity questionnaire; and (iii) misevaluated her mother's testimony.

Any error the ALJ may have made in her evaluation of Cousino's autism at Step Two was harmless. And the ALJ's lack of citation, reference, or discussion of the supervisor's work activity report is not an independent basis for reversal. However, because the ALJ failed to apply proper legal standards by failing to articulate her reasons for discounting Cousino's mother's testimony, I recommend that the Commissioner's final decision denying Cousino's

applications for CID and SSI be vacated and that Cousino's case be remanded for further consideration.

## I.     Procedural History

On July 2, 2020, Cousino applied for CID and SSI.  (Tr. 226, 232).[1]  Cousino alleged that she became disabled on November 1, 2018, due to: (i) bipolar II disorder; (ii) obsessive compulsive disorder ("OCD"); (iii) generalized anxiety disorder; (iv) autism spectrum disorder; (v) borderline intellectual functioning; (vi) Hashimoto's thyroiditis; (vii) difficulties with short-term memory; (viii) allergies; and (ix) learning disability.  (Tr. 226, 232, 253).  The Social Security Administration denied Cousino's application initially and upon reconsideration.  (Tr. 94–103, 105–14, 117–34).  Cousino requested an administrative hearing.  (Tr. 156).

On June 9, 2021, ALJ Patricia Carey heard Cousino's case and denied her applications in a July 30, 2021 decision.  (Tr. 18–32, 64–92).  In so ruling, the ALJ determined that Cousino had the residual functional capacity ("RFC") to perform work at the medium exertional level, except that:

> [Cousino] can frequently climb ladders, ropes and scaffolds.  She is to avoid exposure to dangerous machinery and unprotected heights.  She is able to understand 1-2 step simple tasks.  She is limited to simple routine tasks with regular expectations and few changes.  She is also limited to work that is not at a production rate pace, for example, no assembly line work.  She is limited to responding appropriately to occasional interaction with supervisors, coworkers, and the general public.  She is limited to making simple work-related decisions. She is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur very infrequently, and be adequately and easily explained.

(Tr. 24).

---

[1] The administrative transcript appears in Electronic Case Filing Document 8.

On August 1, 2022, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–3).  On September 23, 2022, Cousino filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Cousino was born on October 23, 2000; she was 18 years old on the alleged onset date and 20 years old on the date of the ALJ's decision.  (Tr. 32, 226, 232).  Cousino completed high school in 2019, where she was placed in an individualized education plan ("IEP").  (Tr. 70, 74, 261, 254); *see* (Tr. 508, 539–46, 548–61, 569–95).  She received specialized job training through Job Connections for Special Needs in 2019.  (Tr. 254).  She had past work as: (i) a waterpark slide attendant; (ii) an assisted living facility attendant; and (iii) grocery store cleaner, cart attendant, and stocker.  (Tr. 254–55).  At the time of the administrative hearing, she also worked part-time at the Goodwill Factory as a material handler.  (Tr. 71–72).  However, the ALJ found that none qualified as past relevant work.  (Tr. 30).

### B.    Relevant Medical Evidence

Cousino's medical history prior to the alleged onset included diagnoses of bipolar I disorder, OCD, and generalized anxiety disorder.  *See* (Tr. 346, 352, 357, 362, 367, 372, 377, 382–83, 387, 392, 397, 402, 407, 413, 417–18, 423, 427, 432, 438, 442, 447, 452, 458, 462, 467,471, 475, 479, 484, 489, 494, 501, 656).  Her symptoms included anxiety, counting rituals, distractibility, depressed mood, irritability, and obsessive and racing throughs.  *See* (Tr. 344, 350, 355, 360, 365, 370, 375, 380, 385, 390, 395, 400, 405, 410, 415, 420, 425, 430, 435, 440, 445, 450, 455–56, 460, 465, 469, 473, 477, 482, 487, 651–52).  Between September 2016 and October 2017, Cousino's Global Assessment of Functioning ("GAF") score was consistently 69,

representing "some mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") 34 (4th ed. 2000); *see* (Tr. 347, 358, 363, 368, 373, 378).  She received medication treatment with Abilify, Ativan, Lamictal, and Risperidone.  *See* (Tr. 347, 353, 358, 363).

On October 26, 2017, Cousino visited Jodl Ohm, LPCC, to initiate counseling services for anxiety.  (Tr. 651).  Cousino further reported that she was an 11th grader at Erie Huron Ottowa Vocational Education ("EHOVE").  (Tr. 653).  She reported that she: (i) had difficulty with comprehension; (ii) was a slow learner; (iii) became overwhelmed by the steps and pace of EHOVE's visual media tech and culinary programs; and (iv) was currently on a 504 plan, with extended time and no group presentations.  *Id.*  Cousino further reported daily anxiety, fear of being able to handle daily stressors without parental support, racing thoughts, and counting rituals.  (Tr. 651).  She reported dwelling on things "all day long" and that she could not "comprehend things around her very well."  *Id.*  Her parents reported that they never left Cousino alone more than 30 minutes and that Cousino followed her mother everywhere, including the restroom.  (Tr. 652).  Ohm referred Cousino to psychiatry services.  (Tr. 655).

On November 27, 2017, Cousino visited Richard G. Litwin, PhD, for a psychological evaluation and recommendations on school accommodations.  (Tr. 505).  Cousino's Wechsler Adult Intelligence Scale 4 full-scale composite IQ score was 72, in the "borderline range."  (Tr. 506).  Her aptitude scores were scores equated to: (i) 12th grade in spelling; (ii) 9th grade in word recognition; (iii) 8th grade in math calculations; (iv) 5th and 6th grade in reading accuracy and writing fluency; and (v) 3rd and 4th grade in reading comprehension.  (Tr. 506–07).  Her Beck OCD Inventory raw score was 55, in the "severe range."  (Tr. 507).  Her GAF score was 60,

4

representing "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning."  DSM-IV-TR 34; (Tr. 508).  Dr. Litwin noted that Cousino was "apt to give up easily and not persist."  (Tr. 506).  Dr. Litwin also stated that Cousino displayed "minor weakness in memory acquisition and retention."  (Tr. 507).  Dr. Litwin diagnosed Cousino with reading disorder, disorder of written expression, OCD, and unspecified attention-deficit/hyperactivity disorder ("ADHD").  (Tr. 508).  Dr. Litwin recommended an IEP with: (i) extra time for test taking; (ii) fewer multiple-choice questions; (iii) a reduced workload; (iv) private test-taking; and (v) extra tutoring and assistance with comprehending test questions.  (Tr. 508).  Dr. Litwin noted that Cousino would also need "aggressive treatment for her anxiety."  (Tr. 509).

On December 11, 2017, Cousino visited Stephen E. Schuldt, MD, for a psychiatric evaluation.  (Tr. 657).  Cousino reported that her baseline mood was "usually happy," but she became "somewhat irritable" if made to do something she did not want to do.  *Id.*  She also reported emotional distress if she was unable to engage in counting and checking rituals.  *Id.*  Her mental status exam results were unremarkable.  (Tr. 658).  Cousino's parents further reported that she struggled with "emotionality, mood swings, and reactive anger" and was "hyperactive, silly, inattentive and restless."  (Tr. 657).  Dr. Schuldt recommended that Cousino continue her medication treatment with Risperidone and Lamictal and counseling.  (Tr. 659).  Dr. Schuldt noted that Cousino "does not demonstrate traits of ASD though she has struggled to make friends over time."  (Tr. 657).

On January 11, 2018, Cousino reported to Dr. Schuldt having disclosed "bad thoughts or behavior" to her mother.  (Tr. 756).  Cousino reported counting and checking rituals, tapping excessively as a coping mechanism.  *Id.*  She also reported difficulty with social relationships:

(i) eating by herself at school; (ii) difficulty getting along with same-aged peers; (iii) resistance to being separated from her parents; and (iv) a preference for being with her parents at home over school. *Id*. Cousino's mother suspected that she was autistic. *Id*. Cousino's mental status exam results were unremarkable. *Id*. Dr. Schuldt adjusted Cousino's medication. (Tr. 757).

On February 14, 2018, Cousino reported to Dr. Schuldt that she continued to struggle with anxiety, checking rituals, reassurance seeking, and OCD. (Tr. 759). She reported that she was "somewhat more argumentative at times, but this was transient in nature." *Id.* She also reported that she had been eating lunch with "friends rather than by herself in the library." *Id*. Her mental status examination results were unremarkable. *Id*. Dr. Schuldt recommended that Cousino taper off from Risperidone and that she be placed in an IEP. (Tr. 547, 760).

On February 15, 2018, psychologist Paul L. Hiszem evaluated Cousino's achievement, cognitive ability, and medical background as part of her parents' request for an IEP. (Tr. 544). Cousino's aptitude scores equated to: (i) 8th grade in letter-word identification; (ii) 6th grade in math calculations; (iii) 5th grade in applied problems and writing samples; and (iv) 3rd grade in passage comprehension. (Tr. 544–45). Hiszem noted that Cousino appeared calm and attentive, whereas she appeared anxious and overwhelmed in the presence of her parents. (Tr. 544). Hiszem further noted that Cousino was unable to respond as problems became more complicated and that her comprehension weakness "seemed to reflect some difficulty at her being able to keep her focus on all of the information in the passage." (Tr. 544–45). Hiszem stated that Cousino would benefit from "chunking" of subject material, "front load information" that would be presented in class, and re-reading material. (Tr. 545). He noted that her anxiety levels could "have a very negative impact on her ability to process information." *Id.*

On March 12, 2018, Hiszem evaluated Cousino's adaptive behavior.  (Tr. 546).
Cousino's adaptive behavior composite score was in the "Moderately Low range."  *Id.*  Hiszem
noted Cousino's specific areas of concern as: (i) remembering to do something in the future;
(ii) understanding sarcasm; (iii) relating new material to what she knew; (iv) engaging in small
talk; (v) and participating in conversation on nonpreferred topics.  *Id.*  Hiszem stated that
Cousino's areas for improvement related to her anxiety and situations which exacerbated her
anxiety.  *Id.*

Cousino's teachers also completed surveys regarding Cousino's social emotional status,
speech and language skills, and fine motor skills.  *See* (Tr. 548–59).  Lisa York, Cousino's career
tech instructor, stated that Cousino's social emotional status appeared to negatively affect her
educational progress and recommended extended time, a modified curriculum, and guided notes.
(Tr. 549).  York further stated that Cousino's speech and language skills and fine motor skills did
not negatively affect her educational progress.  (Tr. 553, 557).  York also noted that Cousino:
(i) had few peer relationships; (ii) was socially immature; (iii) had either inadequate tolerance for
frustration or great self-advocacy skills; (iv) had difficulty approaching new people or
experiences; and (v) avoided speaking situations.  (Tr. 549, 552).

Ben Stover, Cousino's academic instructor, stated that Cousino's social emotional status,
speech and language skills, and fine motor skills did not appear to negatively affect her
educational progress.  (Tr. 551, 555, 559).  Stover noted that Cousino was receiving
accommodations: (i) small group testing; (ii) extended time for assignments; (iii) guided
practice; and (iv) corrective feedback.  (Tr. 558).  He further stated that Cousino appeared
motivated and focused to finish assignments in the classroom, but her frustration sometimes

boiled over when she left.  (Tr. 551).  And he stated that Cousino struggled with application problems until the problems were setup, and she needed "a lot of reassurance."  (Tr. 559).

On March 14, 2018, Cousino's evaluation team determined that she was eligible for IEP.  (Tr. 571).  Cousino also visited Dr. Schuldt, reporting that her mood was "better," she was "more relaxed," and she was not "as emotionally labile."  (Tr. 761).  She also reported anxiety and OCD symptoms, including: (i) counting and checking rituals, feeling as though she "will die" if she did not perform the ritual; (ii) frequent questions to her mother for reassurance; and (iii) worry about public perception.  *Id.*  Her mental examination results were remarkable for anxious mood.  *Id.*  Dr. Schuldt refilled Cousino's medications and discussed replacing Risperidone with an SSRI.  (Tr. 762).

On April 11, 2018, Cousino reported to Dr. Schuldt mood swings, outbursts, and depressed mood since her last visit.  (Tr. 763).  She also reported seeing shadows at night and "feeling like she can hear her name called."  *Id.*  Her mental status exam results were remarkable for "somewhat slowed" psychomotor behavior and depressed mood.  *Id*.  Dr. Schuldt prescribed Luvox to replace Risperidone.  (Tr. 764).

On April 23, 2018, Cousino reported to Dr. Schuldt manic symptoms over the weekend: (i) hyperactivity; (ii) restlessness; (iii) excessive speech; (iv) labile mood; and (v) elevated and irritable mood.  (Tr. 765).  She also reported anxiety and OCD symptoms.  *Id.*  Her mental status exam results were unremarkable.  *Id*.  Dr. Schuldt diagnosed Cousino with bipolar disorder and replaced Luvox with olanzapine.  (Tr. 766).

On April 27, 2018, Cousino visited Bellevue Hospital's emergency department for an evaluation of a "mental breakdown."  (Tr. 510–11).  According to Cousino's mother, Cousino had been manic, agitated, and emotionally labile on the previous several days.  (Tr. 511).

8

Cousino was provided Ativan, after which she had "significant improvement" in her symptoms. (Tr. 520).  Cousino was discharged.  (Tr. 521–22).

On April 30, 2018, Cousino reported to Dr. Schuldt that she struggled with mood lability, reduced need for sleep, racing thoughts, and hyperactivity.  (Tr. 767).  She also informed Dr. Schuldt of her hospital visit, reporting that further doses of Ativan were unhelpful.  *Id.*  Her mental status exam results were unremarkable.  *Id.*  Dr. Schuldt adjusted Cousino's dosage of olanzapine.  (Tr. 767–68).

On May 9, 2018, Cousino reported to Dr. Schuldt that, overall, she had "not struggled with elevated mood or depression" but continued to struggle with OCD symptoms.  (Tr. 769). She reported frequently counting objects throughout the day.  *Id*.  Her family also reported that Cousino needed redirection to follow-through with tasks.  *Id*.  Cousino's mental status exam results were unremarkable.  *Id*.  Dr. Schuldt refilled Cousino's prescriptions.  (Tr. 770).

On June 13, 2018, Cousino reported to Dr. Schuldt that she had been struggling with fatigue, especially in the morning.  (Tr. 772).  She also reported feeling angry.  *Id.*  Cousino's parents reported that Cousino struggled with mood swings and requested that Cousino be put back on Risperidone.  *Id*.  Cousino's mental status exam results were remarkable for anxious appearance and depressed and angry mood.  *Id*.  Dr. Schultz cross titrated olanzapine to Risperidone.  (Tr. 773).

On July 11, 2018, Cousino reported to Dr. Schuldt that her emotional regulation had improved with Risperidone.  (Tr. 774).  She reported her interval mood as "positive and euthymic."  *Id.*  She reported that her overall anxiety was "manageable."  *Id.*  She also reported counting and checking rituals but sought reassurance less frequently.  *Id.*  Her mental status exam results were remarkable for "somewhat anxious" affect.  *Id.*  Dr. Schuldt refilled her

medication.  (Tr. 775).  At the request of Cousino's parents, Dr. Schuldt also referred Cousino to the Cleveland Clinic Autism Center.  *Id.*

On August 15, 2018, Cousino reported to Dr. Schuldt that she'd been "doing well" but had "some difficulty" with fatigue and struggled with moodiness.  (Tr. 777).  She reported separation anxiety in anticipation of starting the school year.  *Id*.  Her mental status exam results were remarkable for "somewhat [d]epressed" mood.  *Id*.  Dr. Schuldt refilled Cousino's medication.  (Tr. 778).

On October 24, 2018, Cousino reported to Dr. Schuldt that her anxiety and OCD had increased since starting the school year, as well as "some depression."  (Tr. 780).  She also reported a recent breakup.  *Id.*  Her mental status exam results were remarkable for anxious mood and affect. *Id.*  Dr. Schuldt adjusted Cousino's medication, increasing her dosage of Risperidone.  (Tr. 781).

On January 9, 2019, Cousino reported to Dr. Schuldt that she had been doing "relatively well" but was stressed about returning to school following the Christmas break.  (Tr. 783).  She also reported counting and checking rituals, though her mother reported that the rituals had improved over time.  *Id.*  Her physical examination results were remarkable for anxious mood and appearance.  *Id.*  Dr. Schuldt noted that the Cleveland Clinic had diagnosed Cousino with autism spectrum disorder and added the diagnosis to his clinical impression.  (Tr. 784). Dr. Schuldt refilled Cousino's prescriptions.  *Id.*

On March 5, 2019, Cousino's eligibility for IEP was reassessed.  (Tr. 573–75). Cousino's treatment team reported that Cousino received a "good report" from her job coach for her work at a grocery store, had "positive peer relationships," and was on track to graduate with a 3.7 GPA.  (Tr. 573–75, 581).  Cousino's social studies teacher noted that Cousino was unable

to understand questions which required her to infer, explain, or summarize and needed assistance on every assignment.  (Tr. 589–90)  Cousino's job training coordinator further stated that she: (i) "lacks the ability or motivation to show any sense of urgency"; (ii) "is inconsistent with self-management"; (iii) "has minimal understanding of time constraints"; and (iv) appeared "aloof." (Tr. 585)  Cousino self-reported being independent with her activities of daily living, except transportation and scheduling appointments.  (Tr. 586–87)  Cousino was approved for IEP.  (Tr. 595).

On April 3, 2019, Cousino reported to Dr. Schuldt that she had been "doing very well." (Tr. 785).  She reported OCD symptoms when under stress and some social anxiety.  *Id.*  Her mental status results were unremarkable.  *Id*.  Dr. Schuldt refilled Cousino's medications.  (Tr. 786).

On May 15, 2019, Cousino reported to Dr. Schuldt that she was "upset" because she would not be able to see or talk to a certain boy at school after graduation.  (Tr. 788).  She also reported difficulty with depression, tiredness, high anxiety, and OCD.  *Id.*  During the visit, Cousino was tearful and argued with her mother about her relationship with her boyfriend.  *Id.* Her mental status exam results were remarkable for stressed mood and questionable insight and judgment.  (Tr. 788–89).  Dr. Schuldt refilled Cousino's medications.  (Tr. 789).

On August 14, 2019, Cousino reported to Dr. Schuldt that she had been doing "very well" and that her mood had been "positive."  (Tr. 791).  She reported that her anxiety and OCD symptoms were manageable.  *Id.*  Her mental status exam results were unremarkable.  *Id.* Dr. Schuldt refiled prescriptions.  (Tr. 792).

On November 4, 2019, Cousino visited Sarah LaMarca, CNP, reporting bipolar II symptoms: (i) snapping easily; (ii) breaking things; and (iii) being set off and having her day

11

ruined by "[o]ne little thing." (Tr. 794). Her mental status exam results were remarkable for: (i) avoidant eye contact; (ii) restless motor activity; (iii) anxious mood. *Id.* Nurse Practitioner LaMarca diagnosed Cousino with bipolar II disorder and OCD. (Tr. 795).

On December 30, 2019, Cousino reported to Nurse Practitioner LaMarca that she'd been depressed for several weeks, was only taking Lamictal, experienced extreme fatigue, and was mixing up of letters and numbers. (Tr. 715). Her mental status exam results were remarkable for anxious mood and guarded behavior. (Tr. 716–17). Nurse Practitioner LaMarca refilled Cousino's prescriptions. (Tr. 717–18).

On February 21, 2020, Cousino reported to Nurse Practitioner LaMarca that she was doing "very well." (Tr. 703). Her mental status exam results were remarkable for limited fund of knowledge. (Tr. 704–05). LaMarca refilled medications. (Tr. 705).

On March 2, 2020, Cousino reported to Nurse Practitioner LaMarca that she was spending eight hours of the day counting and obsessing over potential disasters. (Tr. 699). Her mental status exam results were remarkable for anxious mood. (Tr. 700–01). Nurse Practitioner LaMarca prescribed fluvoxamine. (Tr. 701).

On March 30, 2020, Cousino reported to Nurse Practitioner LaMarca in a telehealth visit that she was "doing so much better," with less counting and obsessive behavior. (Tr. 689). Her mental status exam results were remarkable for anxious mood and constricted affect. (Tr. 690). Nurse Practitioner LaMarca refilled Cousino's medication. (Tr. 691).

On August 31, 2020, Cousino reported to Nurse Practitioner LaMarca in a telehealth visit that "everything is good at home." (Tr. 818). Her mental status exam results were remarkable for limited social and emotional reciprocity. (Tr. 819). Nurse Practitioner LaMarca refilled Cousino's medication. (Tr. 820–21).

Meanwhile, Cousino visited Firelands Regional Medical Center for counseling services. Initially, Cousino reported anxiety and feeling "down" and "tearful" most of the time.  (Tr. 724). Her mother reported that Cousino spent up to 25 minutes in the shower due to counting behaviors.  (Tr. 708).  Cousino consistently reported doing well between April and June 2020, when she was staying at home.  (Tr. 679, 682, 685, 687).

### C.     Relevant Opinion Evidence

On August 29, 2020, psychologist Jennifer Swain evaluated Cousino's mental health-related limitations based on a review of the medical evidence.  (Tr. 99–102).  Swain determined that Cousino was capable of: (i) understanding and remembering 1-2 step tasks; (ii) sustaining concentration and persistence to complete simple 1-2 tasks; (iii) occasional intermittent interactions with others; and (iv) performing simple routine tasks with regular expectations and few changes.  (Tr. 101–02).  On November 11, 2020, Bonnie Katz, PhD, concurred with Swain's opinion.  (Tr. 123–24).

### D.     Relevant Third-Party Evidence

On April 12, 2021, Patrick Lynch, Cousino's supervisor at the Goodwill Factory, filled out a questionnaire on her work activity.  (Tr. 325–26).  Lynch stated that Cousino worked an average of 25 hours per week as an assembler.  (Tr. 325).  Lynch checked answers indicating that Cousino: (i) completed all the usual duties of her position; (ii) was able to complete her job duties without special assistance; (iii) regularly reported to work on time; and (iv) completed her work in the same amount of time as other employees.  *Id*.  However, Lynch stated that Cousino received as special assistance fewer/easier duties, more rest periods, extra help/supervision, and lower production standards.  *Id*.  In light of her accommodations, Lynch stated that Cousino's productivity was "50% or less of other employees' productivity."  (Tr. 326).

### E.      Relevant Testimonial Evidence

#### 1.      Cousino

Cousino testified that she could not work because of her comprehension difficulties and anxiety.  (Tr. 73).  As an example, Cousino testified that she was unable to pass a lifeguard test because she could not understand the instructions.  *Id.*  She testified that she also could not understand where she was supposed to while working as a water park slide attendant.  *Id.*  And she testified that she got by in school by writing down previously memorized information, even though she did not understand what the information was.  (Tr. 74).

Cousino testified that on a typical day she ate breakfast, dressed, groomed, went to work, and ate dinner with her family.  (Tr. 75).  She also played video games.  (Tr. 77).  Cousino testified that she worked for the Goodwill Factory from 6:00 a.m. to 11:30 a.m. making parts for Whirlpool.  (Tr. 71–72).  She testified that she initially worked on a "regular line, but it was too stressful for me."  (Tr. 72).  She also testified that she often forgot to do chores and needed reminders.  (Tr. 75–76).

#### 2.      Alicia Chavarria

Alicia Chavarria, Cousino's mother, testified that Cousino could not work because of anxiety and poor comprehension and short-term memory, and Cousino was easily overwhelmed.  (Tr. 78).  As examples, Chavarria testified that Cousino failed her lifeguard exam because she could not "understand the steps in what she needed to do to be able to rescue somebody from the water."  (Tr. 79).  Chavarria testified that they then assigned Cousino slide attendant duties, which required Cousino to rotate among different slides.  (Tr. 79).  Chavarria testified that Cousino would become overwhelmed and cry because she could not understand when she was supposed to rotate.  (Tr. 79–80).

As a third example, Chavarria testified that Cousino's job at an assisted living facility required her to clear and set up tables, wash dishes, and pass snacks around to each room.  (Tr. 80).  Chavarria testified Cousino frequently called her crying because of the stress of not being able to keep up.  *Id.*  Chavarria testified that Cousino did not understand the order in which she needed to do things or what steps she needed to take to get it all done.  *Id.*

Chavarria testified that Cousino received accommodations even when she worked on the "regular line" for the Goodwill Factory.  (Tr. 81).  Chavarria testified that Cousino became overwhelmed even with the accommodations and would come home crying.  *Id.*  Because of the anxiety, Chavarria testified that Cousino was placed in the "organizational employee line" with other special needs people.  *Id.*  Chavarria testified that the additional accommodations on that other line included job coach monitors who checked in with Cousino periodically and supervisors present to assist or take over if Cousino needed to leave.  *Id.*  Chavarria testified that Cousino also worked at a reduced pace because it was "paid by piece rate."  (Tr. 81, 85).

Chavarria testified that Cousino also needed "a lot of help with her homework" and frequently worked with Chavarria two hours every night to finish before IEP.  (Tr. 83).  Chavarria testified that she had to constantly remind Cousino to do chores.  (Tr. 84–85).  Chavarria testified that Cousino forgot to turn off the stove.  (Tr. 85).  And Chavarria testified that Cousino had no "follow through" with two-step instructions, such as "grab this and take it in there, and then on your way back bring this."  (Tr. 84).

15

### 3. Vocational Expert

Vocational expert ("VE") Rebecca Kendrick testified that 15% off-task behavior, including time needed for redirection, would be work preclusive.  (Tr. 90).  The VE also testified that accommodations similar to those at the Goodwill Factory would preclude competitive employment.  (Tr. 91).

## III. Law & Analysis

### A. Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *Id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B. Threshold Issues

I address Cousino's challenges to the ALJ's decision out of order to fit within the sequential evaluation process.  First, I address Cousino's Step Two argument that the ALJ erred when she failed to identify autism as a medically determinable impairment.  Second, I address

Cousino's Step Four argument that the ALJ failed to consider the record as a whole when the ALJ decision did not cite, mention, or discuss Lynch's work activity questionnaire.  Embedded within Cousino's Step Four argument is a separate challenge to the ALJ's consideration of Chavarria's testimony.  I address that issue third.

      **C.**      **Step Two – Autism as a Severe Medically Determinable Impairment**

Cousino argues that the ALJ erred when she failed to identify her autism as a medically determinable impairment, because the ALJ ignored treatment records repeatedly reflecting a diagnosis of autism spectrum disorder.  ECF Doc. 10 at 21–23; ECF Doc. 13 at 7.  Cousino argues the error was not harmless because the ALJ only considered medically determinable impairments in her RFC analysis.  ECF Doc. 10 at 24.  And she argues that the ALJ would not otherwise have been able to recognize limitations arising from autism spectrum disorder.  *Id.* The Commissioner disagrees.  ECF Doc. 11 at 14–19.

At Step Two, a claimant must show that she hast *at least one* "severe" medically determinable impairment.  20 C.F.R. § 416.920(a)(4)(ii), (c); 20 C.F.R. § 416.924(c).  A condition must qualify as a "medically determinable impairment" before the ALJ determines whether it is "severe."  20 C.F.R. § 404.1521; 20 C.F.R. § 416.921.  Whether a condition qualifies as a "medically determinable impairment" is determined exclusively on the basis of objective medical evidence.  20 C.F.R. § 404.1521; 20 C.F.R. § 416.921 ("We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).").  And for a medically determinable impairment to be severe, it must cause more than a "minimal effect on the individual that it would not be expected to interfere with [her] ability to work irrespective of age, education, and work experience."  *Farris v. Sec'y of Health &*

*Hum. Servs.*, 773 F.2d 85, 90 (6th Cir. 1985); *see also* 20 C.F.R. § 416.922; 20 C.F.R.

§ 416.924(c).

Step Two is "intended to screen out totally groundless claims." *Nejat v. Comm'r of Soc.*

*Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quotation marks omitted).  If the claimant does not

meet this Step Two burden, the claimant is categorically *not* disabled.  20 C.F.R. § 404.1520(c).

But if she does, the ALJ must consider all *all of her impairments* (even those that aren't

"severe") at the remaining steps in the sequential evaluation.  *Nejat*, 359 F. App'x at 576.  And

so long as the ALJ considered all the claimant's impairments in the other steps, any Step Two

error is harmless.  *Id.* at 577.

The ALJ arguably failed to apply proper legal standards in her evaluation of Cousino's

autism at Step Two.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  In making her Step Two

findings, the ALJ stated:

> [Cousino] alleged autistic disorder . . . .  The earlier records noted that [Cousino]
> had autism, and her mother thought [she] might be autistic.  (6F; 12F/9, 45).
> However, the more recent mental health treatment records document [that Cousino]
> does not demonstrate traits of autism spectrum disorder.  (6F/17; 12F/6).  . . .
> Because the record is devoid of any medical evidence to establish the existence of
> [this] condition[], the undersigned finds [autism is] not a medically determinable
> impairment.  However, in the event [autism] were found to be [a] medically
> determinable impairment[], the [RFC] set forth herein would fully accommodate
> the impairment[].

(Tr. 22).

That paragraph boils down to a single reason to support the conclusion that autism

spectrum disorder was not a medically determinable impairment: discernable traits of autism

spectrum disorder were not present in Dr. Schuldt's December 11, 2017 treatment notes.  *See id.*

(citing (Tr. 657, 753)).  Although accurate, that would only establish that autism spectrum disorder

was not a medically determinable impairment nearly a year *before* the alleged onset date of

18

November 1, 2018. The ALJ's reasoning does not, however, address the more pertinent issue of whether treatment notes from *after* the date last insured and *during* the period under adjudication would establish the existence of a medically determinable impairment of autism spectrum disorder.

Nevertheless, any articulation error in the ALJ's Step Two analysis was harmless. To satisfy her Step Two burden, Cousino was required to submit evidence from acceptable medical sources with medically acceptable clinical and laboratory diagnostic techniques that would support the existence of autism spectrum disorder. 20 C.F.R. § 404.1521; 20 C.F.R. § 416.921. Cousino did not submit any such evidence. She instead submitted evidence showing that: (i) Dr. Schuldt referred her for an autism evaluation (Tr. 775); (ii) an evaluation from the Cleveland Clinic Autism Center determined that she had autism (Tr. 784); and (iii) Dr. Schuldt adopted the diagnosis, despite his earlier finding that traits of autism spectrum disorder were absent (Tr. 784, 786, 789, 792). None of Cousino's providers after Dr. Schuldt diagnosed Cousino with autism. *See* (Tr. 691, 701, 705, 707–08, 711–12, 717). Dr. Schuldt's treatment notes do not state what the basis was for the autism diagnosis. And although Cousino submitted the Cleveland Clinic's autism evaluation records, she did so on appeal to the Appeals Council and has not sought a remand under Sentence Six for the ALJ to reconsider her decision in light of that evidence. *See Elliott v. Apfel*, 28 F. App'x 420, 423 (6th Cir. 2002) ("If the Appeals Council declines to review an ALJ's decision, federal courts cannot consider evidence not presented to the ALJ."); (Tr. 39–60); *see generally* ECF Doc. 10; ECF Doc. 13. Without that evidence, the ALJ was warranted in her finding that autism spectrum disorder was not a medically determinable impairment. *Cf. Brinkey v. Berryhill*, No. 17-cv-00775, 2018 WL 1366692, at *3–5 (D. Colo. Mar. 16, 2018).

Moreover, a review of the ALJ decision indicates that the ALJ considered Cousino's autism at later steps in the sequential evaluation. She stated that even if autism "were found to be [a]

medically determinable impairment[], the residual functional capacity set forth herein would fully accommodate the impairment[]."  Unfortunately, the ALJ never explained how that could be.

However, at Step Three, the ALJ indicated that she considered "[t]he severity of [Cousino's] mental impairments . . . singly and in combination." (Tr. 22).  At Step Four, the ALJ acknowledged that autism was one of the impairments upon which Cousino sought disability and discussed Cousino's and Chavarria's statements on how Cousino's comprehension, poor memory, mood lability, low stress tolerance, and counting rituals affected her.  *See* (Tr. 24–30).  Cousino argues that the alleged Step Two error affected the lens through which the ALJ viewed the evidence at Step Four, as "it . . . stands to reason that the [ALJ] would not recognize limitations arising from this disorder."  ECF Doc. 10 at 24.  But that argument goes to how well the ALJ considered Cousino's autism at later steps in the sequential evaluation, not whether she neglected to consider her autism at all.  For purposes of the ALJ's findings at Step Two, the ALJ's consideration of Cousino's autism impairment was minimally sufficient.  *See Nejat*, 359 F. App'x at 577.  Although the ALJs decision was technically compliant with the regulations based on the record before her, because I am recommending remand on different grounds, I would expect Cousino would cause the most recent medical evidence to be put before the ALJ upon remand and that a reconsideration of Cousino's medically determinable impairments would occur.

### D.    Step Four – Failure to Consider the Record as a Whole

Cousino argues that the ALJ failed to consider the record as a whole, because the ALJ's decision did not cite, mention, or discuss the work activity questionnaire completed by Patrick Lynch, her supervisor at the Goodwill Factory.  ECF Doc. 10 at 17–18; ECF Doc. 13 at 1–5.  Cousino argues that the omission prejudiced her because, according to the VE, the accommodations she received at the Goodwill Factory would preclude all competitive work.

ECF Doc. 10 at 18.  Cousino further argues that the error impacted the ALJ's analysis of Chavarria's testimony, because the ALJ did not address Chavarria's testimony of how Cousino's impairments affected her ability to work at the Goodwill Factory.  ECF Doc. 10 at 20–21.  The Commissioner disagrees.  ECF Doc. 11 at 12–13.

At Step Four, the ALJ must determine a claimant's RFC, the most that a claimant can do despite her impairments.  20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1).  In making her RFC finding, the ALJ must consider "all the relevant evidence" in the record.  20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1); *see also* SSR 16-3p, 2016 WL 1119029 *2 (March. 16, 2016) ("Consistent with our regulations, we instruct our adjudicators to consider all of the evidence in an individual's record . . . .").  The obligation to consider all evidence in the record does not imply an obligation to cite or discuss every piece of evidence before the ALJ.  *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005).  All the ALJ is required to do is "consider the evidence as a whole and reach a reasoned conclusion."  *Bosely v. Comm'r of SSA*, 397 F. App'x 195, 199 (6th Cir. 2010).

The ALJ did not fail to apply proper legal standards by not referencing Lynch's questionnaire in her decision.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Both parties agree that Lynch was a non-medical source under the regulations.  Thus, the ALJ was not required to articulate how she considered Lynch's questionnaire.  20 C.F.R. § 404.1520c(d); 20 C.F.R. § 416.920c(d).

Cousino argues that the omission is of greater magnitude because it reflects a failure to consider the record as a whole.  However, the caselaw Cousino relies upon to make her argument is inapposite.  *See Hurst v. Sec'y of Health & Hum. Servs.*, 753 F.2d 517, 519 (6th 1985) (holding that the ALJ erred by not explaining how the ALJ considered lay testimony of the

21

claimant's functional limitations); *Young v. Comm'r of Soc. Sec.*, 351 F. Supp.2d 644, 649 (E.D. Mich. 2004) (holding that the ALJ erred because, although the ALJ referenced a portion of a vocational evaluation into the claimant's functional limitations, the ALJ failed mention other portions of the same evaluation which contradicted the ALJ's RFC finding).  Under the regulations which govern Cousino's application, the failure to articulate how non-medical source statements were considered is not an independent basis for remand.  20 C.F.R. § 404.1520c(d); 20 C.F.R. § 416.920c(d); *see also, e.g.*, *Rice v. Kijakazi*, No. 5:21-302, 2023 WL 2573871, at*3 (E.D. Ky. Mar. 20, 2023); *Page v. Comm'r of Soc. Sec.*, No. 2:21-cv-00166, 2022 WL 4455975, at *7 (E.D. Tenn. Sept. 23, 2022); *Merritt v. Comm'r of Soc. Sec.*, No. 3:20-CV-00647, 2022 WL 1134295, at *8 (W.D. Ky. Feb. 7, 2022); *Hays v. Comm'r of Soc. Sec.*, No. 1:20-cv-02243, 2021 WL 5863976, at *5 (N.D. Ohio Dec. 10, 2021).  Further, the ALJ expressly stated that she gave "careful consideration to the entire record."  (Tr. 24).  The court cannot make the factual finding that a certain part of the record was simply ignored.

Moreover, the failure to consider third-party statements is harmless when the omitted evidence is cumulative of other evidence in the record.  *Page*, No. 2:21-cv-00166, 2022 WL 4455975, at *7.  Lynch's answers describing Cousino's accommodations and work performance at the Goodwill Factory were essentially duplicative of Cousino's and Chavarria's testimony, both of which the ALJ expressly considered.  *Compare* (Tr. 25–26), *with* (Tr. 325–26).  The propriety of how the ALJ considered that other evidence is a separate issue, which I address below.

Thus, I find no basis for remand on account of Cousino's challenge to the ALJ's consideration of Lynch's work activity questionnaire.

**E.     Step Four – Chavarria's Testimony**

Cousino argues that the ALJ failed to apply proper legal standards in her evaluation of Chavarria's lay witness testimony.  ECF Doc. 10 at 19–21; ECF Doc. 13 at 5–6.  Cousino argues that the ALJ was required to analyze Cousino's testimony under the same regulatory factors which govern opinion evidence.  EC Doc. 10 at 19, 21.  She argues that ALJ's analysis failed to engage with Chavarria's observations of how Cousino's impairments affected her real-world functioning.  *Id.* at 20.  And she argues that the ALJ's analysis failed to build an accurate and logical bridge between the evidence and the result.  *Id.* at 21.  The Commissioner disagrees. ECF Doc. 11 at 14.

The ALJ failed to apply proper legal standards in her evaluation of Chavarria's lay witness testimony.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ determined that Chavarria's testimony on Cousino's functional limitations was only partially persuasive:

> The undersigned notes that [Chavarria] is not a medical professional.  As a lay witness, she is not competent to make a diagnosis or argue the severity of [Cousino's] symptoms in relation[] to her ability to work.  The opinion of a layperson is far less persuasive on those same issues than are the opinions of medical professionals as relied on herein.  Most important, the clinical or diagnostic medical evidence that is discussed more thoroughly below does not support her statements.  The undersigned finds that the statement's [sic] of [Chavarria's] mother to be persuasive only to the extent that they are consistent with the determination herein.

(Tr. 26).

Contrary to Cousino's argument, the ALJ was not required to evaluate Chavarria's testimony under the same factors as opinion evidence.  ECF Doc. 10 at 20.  The reason why is because Chavarria was not a medical source.  20 C.F.R. § 404.1520c(d); 20 C.F.R. § 416.920c(d).  However, that does not mean, as the Commissioner implies, that the ALJ was free to discount Chavarria's testimony without comment.  *See* ECF Doc. 11 at 12–14.  On the

contrary, the ALJ "must give reasons for not crediting the testimony that are germane to each witness." *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012).  And, as discussed below, it is there that the ALJ erred.

The first three reasons given by the ALJ are legally inadequate.  Regardless of Chavarria's medical expertise or lack thereof, the ALJ was required to consider her testimony. *See* SSR 16-03p, 2016 WL 1119029, at *7 ("The adjudicator will consider any personal observations of the individual [by non-medical sources] in terms of how consistent those observations are with the individual's statements about . . . her symptoms as well as all of the evidence in the file."); *see also* 20 C.F.R. § 404.1529(c)(3).  Chavarria also did not "diagnose" Cousino with anything; rather, she testified to her own personal observations and Cousino's self-reports of how Cousino's impairments affected Cousino's performance at school, in daily life, and at work. *See* (Tr. 78–86).  And evidence from non-medical sources is not inherently less persuasive than any other piece of evidence.  The regulations are quite clear on the types of evidence an ALJ is allowed to disregard: (i) decisions by governmental agencies and nongovernmental entities; (ii) disability examiner findings; and (iii) statements on issues reserved for the Commissioner.  20 C.F.R. § 404.1520b(c).  Lay witness testimony is not among the three categories; thus, by omission, it *cannot* be dismissed as inherently less persuasive than other evidence. *E.g.*, *Roegner v. Comm'r of SSA*, No. CV-20-01974, 2022 WL 1078906, at *6 (D. Ariz. Apr. 8, 2022); *Ellen S. v. Kijakazi*, No. 5:20-cv-01940, 2022 WL 221225, at *6 (C.D. Cal. Jan. 24, 2022); *Tanya L.L. v. Comm'r of Soc. Sec.*, 526 F. Supp.3d 858, 870 (D. Or. 2021).

The ALJ's inconsistency finding does not cure the legal inadequacy of the other three. As with Cousino's subjective symptom complaints, the ALJ found Chavarria's corroborating testimony only partially consistent with the other medical and non-medical evidence.  (Tr. 26,

30).  In the paragraphs surrounding both conclusions, the ALJ summarized the medical and non-medical evidence in the record.  *See* (Tr. 25–30).  However, the ALJ did not articulate in what way the medical evidence was consistent or inconsistent with either Cousino's subjective symptom complaints or Chavarria's corroborating testimony.  It was incumbent upon the ALJ to build a logical bridge between the evidence and her conclusions.  *Fleischer*, 774 F. Supp.2d at 877.  Our "obligation is to review the ALJ's rationale, not invent a new one or speculate as to how the ALJ might have reached her conclusion."  *Freeze v. Comm'r of Soc. Sec.*, 2019 WL 4509130, at *2 (E.D. Mich. Sept. 19, 2019).  Moreover, Chavarria's testimony fully corroborated the information provided by Goodwill Factory supervisor Patrick Lynch.

Thus, a remand is warranted for the ALJ to provide clearly articulated reasons for why the evidence was inconsistent with Chavarria's testimony.

**IV.    Recommendation**

Because the failed to ALJ apply proper legal standards by giving legally sufficient reasons for discounting Chavarria's testimony, I recommend that the Commissioner's final decision denying Cousino's applications for CID and SSI be vacated and that Cousino's case be remanded for further consideration.

Dated: May 4, 2023

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

26